AGLIA EVANS et al., Appellants, v. ETHEL EVANS, Appellee.

No. 44860.

MAY 13, 1941.

REHEARING DENIED OCTOBER 17, 1941.

Arthur W. Smith and Cornwall & Cornwall, for appellants.

Baldwin & James and H. E. Narey, for appellee.

WENNERSTRUM, J.—This litigation has developed by reason of the claimed failure of a grantee in a conveyance of land in Clay County, Iowa, to carry out the alleged provisions of an oral agreement to pay certain debts that developed in the handling of the estate of the former owner. The trial court refused to burden the land deeded to the grantee with a lien covering the indebtedness that grantors claimed the grantee or her agent, in her behalf, had agreed to pay. The plaintiffs have appealed. A summary of the facts that have occasioned this litigation is hereafter set forth.

Edward Evans died intestate on July 4, 1924, leaving as his heirs, his widow, Aglia Evans and four children, namely: Marie Morrow, Lester E. Evans, George A. Evans, and Fred L. Evans. At the time of the death of Edward Evans he was the owner of the South one half of Section 16, Township 97, Range 35, Clay County, Iowa, and also a small residence property in the town of Dickens, Iowa. The Southeast quarter of Section 16, a portion of the land just referred to, was encumbered with a mortgage of $15,000 at the time of the death of Edward Evans. The Southwest quarter of Section 16, at that time, was encumbered with a mortgage of $10,000. This last-mentioned quarter section of land was the homestead of the Evans family and is the land involved in this present litigation. At a time subsequent to the death of Edward Evans, the widow and the heirs of the decedent signed various notes. About the time the Edward Evans estate was closed, the holder of the $15,000 mortgage was demanding payment and in order to avoid foreclosure a $2,000 payment was made on this indebtedness. This payment was first financed through banks and later, about June 20, 1932, the money was borrowed from H. C. Hess on a promissory note signed by the widow and the Evans heirs, due two years from date. The heirs also owed the Clay County National Bank of Spencer, Iowa, approximately $1,500 and there were other debts owed by the heirs jointly.

Sometime in 1932 the holder of the $15,000 mortgage threatened foreclosure of their mortgage on the Southeast quarter of Section 16, and about that time the widow and heirs of Edward Evans executed a warranty deed conveying the Southwest quarter to William Evans (not one of the Evans heirs). This deed was dated February 10, 1932, recorded May 24, 1932 and the legal title remained in William Evans until the transfer and conveyance was subsequently made to Ethel Evans, the defendant in this present action. The conveyance to William Evans was made in anticipation of a deficiency judgment under the foreclosure proceedings involving the $15,000 mortgage. At the time the deed was given to William Evans, he signed a further warranty deed, leaving the name of the grantee blank.

In December 1934, H. C. Hess commenced a suit in Clay County against the widow Aglia Evans, co-plaintiff in the pres-

ent litigation, and against the Evans heirs, to wit: George A. Evans, Fred L. Evans, Marie Morrow, and Lester E. Evans. Ethel Evans, the wife of George A. Evans, was not a party to the Hess suit inasmuch as she had not signed the note. Judgment was entered on the Hess note against the widow and the Evans heirs in May 1935. George A. Evans died intestate in 1936 and the estate was probated in the Clay County District Court. Ethel Evans, the defendant herein, was administratrix. There was no claim filed in the George A. Evans estate growing out of the Hess judgment or on account of the claimed contract made by Evans as an individual or as agent for his wife. On June 13, 1937 by reason of garnishment proceedings, Fred L. Evans was obliged to pay the Hess judgment. The present action is brought by Aglia Evans, the mother, and Hattie C. A. Helgen, the last-named person being the assignee of the claim of Fred L. Evans, in this present litigation. The assignment to Hattie C. A. Helgen was given as collateral security for certain claimed indebtedness of Fred L. Evans to the assignee.

The basis of the present litigation is that the plaintiffs claim that prior to the Hess note being placed in judgment George A. Evans made an agreement with the widow and the other children to have the Southwest quarter of Section 16 deeded to his wife, Ethel Evans, now the defendant, in consideration of the payment of the estate debts, including the Hess note, and the further payment of the delinquent taxes on the residence property in Dickens, Iowa. This claimed agreement was never reduced to writing and can only be pieced together by an analysis of the testimony of the interested parties. This testimony is hereafter briefly summarized.

Fred L. Evans, who handled a portion of the Edward Evans estate matters, said that he had several talks with his brother, George, about the land and the estate debts and that in one of these conversations during the fall of 1932, George is quoted as saying in substance that he was the only one on these notes who was financially responsible and that if he was going to continue on the estate notes, he wanted the homestead quarter deeded to him as he felt he would be held liable for all the indebtedness and would have to pay it. A second claimed conversation occurred some two or three weeks later, which con-

versation, as related by Fred L. Evans, was as follows: "That he would take up the Hess note if we gave him a quit claim deed," and "I [Fred] told him it was all right with me if it was agreeable with the heirs." Ethel is quoted as saying in this conversation that she did not know whether they would do it or not but that she and George finally said it would be agreeable with them.

In February 1933, it is claimed George A. Evans, Lester E. Evans and Fred L. Evans had a further conversation and in his testimony relative to this meeting Fred gives his version of the conversation with George as follows: "That he had made arrangements to get deeds from the other heirs and wanted me to send my deed down." Fred further testified: "I executed it and sent it down with the grantee's name blank. I wasn't sure whether he [George] wanted it deeded to himself or to his wife, Ethel. George was in poor health. I relied upon these statements and would not have given the deed except for the agreement to pay the notes. After the deeds were given, the estate note and the Clay County Bank was paid, but the Hess note was not. I talked with George several times about paying the Hess note. He said he 'wanted to delay paying the Hess note for several reasons, wanted the Hess indebtedness to get a little more age on it so he could compromise on it.' " Joy A. Morrow, husband of Marie Evans Morrow, testified that he had several talks with George Evans in 1932 and 1933, some of which were in the presence of the defendant, Ethel Evans. His testimony, in part, was to the effect that George might have the crop and a deed to the homestead, the Southwest quarter, on condition that he keep up the taxes on the mother's home during her lifetime and pay the estate notes, and George is quoted as saying that he would pay the bank note at once and would let the Hess note ride. The defendant, Ethel Evans, is quoted as saying during one of these conversations, "Well it is all right. If you want to try it, why we will try it that way."

Lester Evans testified that prior to the time the deed to the land in controversy was signed by him, George came to his house and said that they owed the bank note and the Hess note and that he, Lester, was unable to pay them. Lester Evans summarizes his conversation with George as follows: "If we

signed the deed, that he would see that the Hess note was taken care of and that he would pay Mother Evans' taxes on her house as long as she lived." Lester further testified that he made the agreement and signed the deed after George agreed to it and that he would not have signed the papers except for this agreement.

Aglia Evans, mother of the Evans children, testifies as to her conversation with George as follows: "He said he would take care of all the indebtedness of the estate and the taxes on my home in Dickens if I would sign the quit claim deed. I would not have signed the deed except for this agreement. George suggested that Ethel be named as grantee."

Mrs. Marie Morrow, wife of Joy Morrow, testified that George A. Evans said that "he was the only one able to take care of the notes and if he had to pay them he wanted the home place. He said he would pay the bank and Hess notes and Mother's taxes if we would deed the farm to him."

Ethel Evans testifies relative to her knowledge of the transaction in substance as follows: "I saw the deeds February 27, 1933 in my home. They were in the possession of my husband, George. I had possession of them the same day at my home shortly after I first saw them and have had possession ever since. I paid the indebtedness at the Clay County bank and had the deeds recorded. I had no knowledge or notice of any claim on the Hess note or of any claim as to the taxes on the Dickens property until after this suit was commenced. After I received the deeds, I paid off the indebtedness at the Spencer bank, made improvements (on the farm), and reduced the mortgage to $3,000. I would not have taken possession of the deeds or would not have done any of these things if I had known any such claim as this was being made by the Evans family. I was not present and did not make the statement on the occasion testified to by my brother-in-law, Fred Evans, or on the occasion testified to by my brother-in-law, Joy Morrow. I never talked with any of the Evans heirs or with Aglia Evans about the Hess note or the Dickens taxes. In consideration of the deeds I was to take care of the notes at the bank, one for $1,200 and one for $240 or $270 and interest and all debts against the farm, with interest on the loan and back taxes, and the $10,000 loan.

I did not know anything about the Hess note—whether it was a bank note. George did not say anything to me about it. He never told me about the Hess note or the taxes on Mother's place and I have never talked to her about it.''

On cross-examination, and after the making of the objection that it was not proper cross-examination and that she was incompetent as a witness under the ''dead man statute'', Ethel Evans testified that she knew that George was trying to get the deeds from the other heirs and that she knew he was getting them in her name. She also testified: ''I just said if he would make that proposition with them we would take over the notes in the bank and the back taxes and the interest, that I would sell my house and put the money into some stock.''

It is the plaintiffs' claim that the defendant obtained the only asset of the estate of any value and that she should not now be permitted to hold this property and fasten the estate debts on the widow and children but should be held on her contract to pay the debts and taxes; that the land should be charged with the payment thereof as part of the consideration of its transfer to her, or if this relief is denied then at least the plaintiffs should be restored to their original position, or put in a position to enforce their claim against her. There is no testimony that the plaintiffs offered or tendered to pay the defendant any money so that she would be placed in her original situation before she made any payments. Plaintiffs' last contention and prayer for relief is without merit.

The evidence shows that Ethel Evans, the wife of George A. Evans, paid off the obligation to the Clay County National Bank; paid up and made current the taxes on the quarter section of land in controversy, and has reduced the indebtedness on the farm from $10,000 to $3,000 by means of insurance money and from funds obtained from the operation of the farm.

It is the claim of the plaintiffs that Ethel Evans should be required to pay the amount of the Hess judgment, which Fred L. Evans had been required to pay in the approximate amount of $2,836.00, and also to pay the taxes on the Dickens town property in the approximate amount of $585.00. The taxes on the town property had been paid by Mr. and Mrs. Lester

Evans and the property was then deeded by Aglia Evans to Mrs. Lester Evans.

There are various legal propositions raised in connection with the plaintiffs' appeal, the same including the question as to the competency of the Evans heirs as witnesses, it being the claim of the appellee that their testimony should not be received and considered by reason of what is termed the ''dead man statute.'' It is the claim of the plaintiffs that George A. Evans was the agent for the defendant and that the defendant was bound by the terms of the contract made by him as her agent and that this contract required her to pay the Hess note and the taxes on the Dickens town property; that the evidence establishes an express or implied contract whose terms bound the defendant to pay the two items heretofore referred to; that a grantee in a quitclaim deed has no protection and takes property conveyed, subject to all equities; that considering the defendant's evidence as true, it must be concluded that George A. Evans defrauded the plaintiffs and that they are entitled to relief from this fraud carried out by the defendant's agent; that if the court holds there was no valid contract or agency relationship proved by the evidence in this case, the whole record discloses a situation which should be governed by the law of restitution and the defendant, having been unjustly enriched at the expense of the plaintiffs as the result of a misunderstanding as to the terms of the supposed contract, should be required to restore plaintiffs to their original position or put plaintiffs in a position so they can resort to the land for the enforcement of their claim.

We have given careful study and consideration to the entire testimony disclosed by the record. It appears to us that the whole transaction was carried on in an extremely careless manner by all parties involved. We do not hold that the Evans heirs and the other witnesses who testify as to their conversations with George A. Evans are incompetent. See Blachly v. Newburn, 179 Iowa 790, 801, 162 N. W. 36, 39, State Bank of Dexter v. Fairholm, 201 Iowa 1094, 1097, 206 N. W. 143, 144. And by reason of our final determination of this case it seems unnecessary to pass upon the claimed agency relationship of George A. Evans to his wife, Ethel Evans. We here have a situation where the Evans heirs are claiming a certain contract

relationship by reason of their claimed agreement with George A. Evans. He is now deceased.

Admitting the competency of the several Evans heirs as witnesses to testify as to their conversations with George A. Evans, it seems to us that this testimony should be received and considered with considerable hesitancy. In our recent case of Williams v. Harrison, 228 Iowa 715, 722, 293 N. W. 41, 44, in passing upon the question of an oral contract with a person since deceased, we said, speaking through Bliss, J., "It has always been the holding of this court, and of the courts generally, that claims of this kind should be scrutinized with the greatest care, and established only upon the most satisfactory evidence." Thereafter in the same case there is set out a summary of our various holdings and as there noted, evidence of contracts of this character must be "clear and satisfactory;" "clear and unequivocal;" "clear; unequivocal and definite;" "clear, substantial and convincing." This claimed contract that the plaintiffs are now seeking to enforce with a claimed deceased agent does not impress this court as having been proved with that degree of certainty that is contemplated by the suggested guides previously noted. If this were a case against George A. Evans, and in reality it is an effort to prove a claimed contract with him, it does not appear to us as being proved by that degree of certainty that is required to maintain a contract such as is claimed for by the plaintiffs.

 It is the claim of the plaintiffs that the defendant is unduly enriched and benefited by the apparent misunderstanding of the parties but as to this contention we do not believe the evidence substantiates this contention. Certain of the Evans heirs testified the value of this land to be worth $110 or $115 an acre. Witnesses for the defendant place the value from $65 to $80 an acre. The valuation of $80 an acre, which was placed upon it by a disinterested, but apparently qualified witness, would make the value of the property $12,800. The defendant has assumed the payment of the $10,000 mortgage, settled with the Clay County National Bank on the bank indebtedness in the amount of $1,440.00, paid the back taxes on the land in the approximate amount of $350.09, and paid the back interest on the mortgage in the approximate amount of $541.66. This makes a total of

$12,331.75. The evidence further shows that subsequent to the receipt of the deeds Ethel Evans made improvements on the property to the extent of $2,000.00. It is apparent that the defendant paid for this quarter section of land all that it was reasonably worth during the depression year of 1933. We can justly take judicial notice of the fact that land values in this State were low during that period.

There are other matters that the trial court undoubtedly took into consideration and this court can well keep in mind. The deeds to Ethel Evans were recorded April 28, 1933. Judgment was obtained on the Hess note and against all the Evans heirs on May 27, 1935. On June 13, 1937, the Hess judgment was paid by virtue of a garnishment proceedings against Fred L. Evans. The present action was not commenced until February 17, 1938. The evidence of Ethel Evans is to the effect that she knew nothing as to the claims of the Evans heirs until this present action was commenced. This was not particularly contradicted by the Evans heirs. At least nothing was done to seek recovery on this claimed contract for approximately five years.

Upon the whole record we are convinced that the equities are with the defendant and that the trial court was correct in its holding. Consequently that court is affirmed.—Affirmed.

HALE, C. J., and SAGER, MILLER, BLISS, MITCHELL, STIGER, and OLIVER, JJ., concur.